IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>vs.<br><br>JESUS YOSMAY WILSON LOMBIDA,<br><br>Defendant. | No. 2:21-cr-00341-DCN<br><br>**ORDER** |

    This matter is before the court on defendant Jesus Yosmay Wilson Lombida's ("Wilson Lombida") motion to suppress, ECF No. 624. For the reasons set forth below, the court denies the motion.

## I.  BACKGROUND

### A.  The Controlled Delivery

    In 2020, the Drug Enforcement Agency ("DEA") began investigating shipments of fentanyl from a source of supply ("SOS") in Mexico to a distributor ("CD-F") in Charleston, South Carolina. ECF No. 634 at 1. During the investigation, the DEA intercepted and seized multiple kilograms of fentanyl and other narcotics intended for delivery to CD-F. Id. In November 2020, the DEA and local law enforcement searched the home of CD-F and seized a large quantity of cocaine. Id. at 1–2. Soon after, local law enforcement located CD-H, an associate of CD-F within the narcotics distribution network. Id. CD-F and CD-H agreed to cooperate with the investigation as confidential informants. Id. CD-F told investigators that the SOS initially sent deliveries of marijuana starting in 2019 but that, by early 2020, the SOS had begun to consistently send packages containing fentanyl and methamphetamine. Id.

1

On May 27, 2021, CD-F informed DEA investigators that the SOS had contacted him and that the SOS stated that he could have multiple kilograms of fentanyl delivered to Charleston, South Carolina via a courier. Id. The DEA immediately planned a "controlled delivery" operation: utilizing CD-F and CD-H to communicate with the SOS and the courier, the DEA task force would control the delivery and intercept the narcotics during a traffic stop of the courier. See ECF No. 1176 at 1–3. DEA Task Force Officer White ("TFO White"), leading the investigation, recruited Lance Corporal William Donahue ("Officer Donahue") and K-9 Officer Laura Maule ("Officer Maule") of the South Carolina Highway Patrol to the operation. ECF No. 634 at 2. TFO White informed Officer Donahue and Officer Maule that they would be conducting the traffic stop of a courier vehicle that would likely be transporting narcotics and that CD-F and CD-H were cooperating with the investigation. Id. Officer Donahue and Officer Maule were instructed to conduct the traffic stop in a routine manner to avoid alerting the courier to the investigation. Id.

On May 28, 2021, the DEA began recording phone calls between CD-F, CD-H, and the SOS. Id. In the first call, the SOS told CD-F that his couriers had "left two" and "took one somewhere else," such that CD-F should expect "two" to be delivered to Charleston, South Carolina. ECF No. 1176, Ex. A, Recorded Call 1 CD-F and SOS, at 00:13–00:20.[1] The SOS further explained, "but they two right there, you ain't got to give them nothing, you know, we'll, they'll wait for, for theirs when, whenever you're finished, but you gotta be real, real careful with these because they, they strong." Id. at

---

[1] The court cites to the government's audio recording exhibits throughout this order. The relevant portions of each audio recording was transcribed and introduced in a single exhibit at the suppression hearing. See ECF Nos. 1175, 1176.

00:23–00:34. The SOS then told CD-F to have CD-H call him to determine a delivery point and "line that up so he can go . . . receive it from them. But just like I said be careful, whoever checks it, make sure that they know what they doing. They're going to have to step on it. Alright. I just don't want to be responsible for any, you know, things." Id. at 01:05–01:36.

Reviewing the first recorded call, TFO White understood that the SOS was "fronting" two kilograms of narcotics—i.e., that SOS would was supplying the narcotics upfront and expecting payment at a later date from the proceeds of the subsequent narcotics sales. ECF No. 634 at 3. Likewise, TFO White interpreted that the delivery would contain such "strong" narcotics such that CD-F needed to ensure both that the person who handled the contents of the delivery was aware of its strength and that they needed to "step on it" or dilute the narcotics before later distribution. Id.

On a subsequent recorded call, the SOS coordinated with CD-H to determine the delivery point. ECF No. 1176, Ex. B, Recorded Call 2 & 3 CD-H and SOS, at 00:35–01:04. The SOS stated, "But like I told [redacted], you guys got to be real, real careful cause, they strong . . . too strong." Id. at 01:42–02:03. Shortly thereafter, the SOS called CD-H again to inform him that the courier had mistakenly driven the delivery to Charlotte, North Carolina and that the SOS was attempting to find someone to "grab 'em and take 'em over there" to Charleston, South Carolina. Id. at 3:30–3:50, 4:30–4:36.

The SOS was next recorded on a call explaining the mistaken delivery to CD-F. ECF No. 1176, Ex. C, Recorded Call 4 & 5 CD-F and SOS, at 00:13–00:18. The SOS stated, "He's got the guy that took 'em over there, the same bald-headed guy, he's going to go pick 'em up and take them to the same place he met you at." Id. at 00:19–00:29.

Further, the SOS then informed CD-F that he was attempting to convince the "bald-headed guy" to take the delivery to Charleston, South Carolina "where he was suppose to take them in the first place." ECF No. 1176, Ex. E, Recorded Call 7 CD-F & SOS, at 00:45–01:15.

On Monday, May 31, 2021, the SOS sent a text message to CD-F stating, "He's going in a car. Where do you want him to go." ECF No. 1176 at 8. CD-F did not reply. Id. The following morning, June 1, 2021, the SOS messaged, "He is on his way now . . . . Should be there in about 3 hours." Id. As directed by investigators, CD-F replied with the address of a Pilot Travel Center gas station in Goose Creek, South Carolina. Id. The SOS forwarded the address sent by CD-F to Wilson Lombida and notified CD-F that the courier was "not going in the truck. He's driving regular car." Id. at 12–13.

As the time for the delivery neared, TFO White recorded another call between CD-F and the SOS. CD-F told the SOS that he will send someone to meet the courier at the delivery point. ECF No. 1176, Ex. F, Recorded Call 8, 9, & 10 CD-F & SOS, at 00:30–00:40. In the recording, CD-F can be heard confirming to investigators that "[the SOS] says it's a black car" and telling TFO White that "I think it's like a Spanish guy or Cuban guy or something like that." Id. at 02:27–02:29, 03:38–03:40. The recording also captures radio messages between members of the investigation team relaying the location of CD-F, the updates from the SOS, and the descriptions of courier and courier vehicle. Id. at 03:18–03:31, 03:37.

The SOS called CD-F to notify CD-F that the courier had reached the Pilot Travel Center but asked if CD-F could "take him somewhere, where he can, you know, where there's less people, where he can give you that." Id. 04:06–04:13. The SOS explained,

"cause he said that, the way things look right there, it don't look like he can, like he can pull them out." Id. at 4:14–4:22. The SOS and CD-F agreed to move the delivery point to CD-F's apartment. Id. 4:22–4:43. The SOS forwarded an address sent by CD-F to the courier. ECF No. 1176 at 13. When communications began to dissolve, the SOS sent a message to CD-F that said "704 386 8508" and told CD-F to "call [the courier]" himself. Id. at 20.

CD-F called the phone number, and a man with a Hispanic accent answered. ECF No. 1176, Ex. G, Recorded Call 11 & 12 CD-F & Lombida, at 00:39. CD-F told the courier to follow his black Acura to proceed to the new delivery point once CD-F arrived at the Pilot Travel Center. Id. at 00:39–0:55. The courier agreed. Id.

In the call recordings, TFO White can be heard providing real time updates of CD-F's movements and communications with the courier to the investigation team over the radio:

> We just shot a phone call to the people driving it. It is a Hispanic male, we are going to have [CD-F] pull into the Pilot Gas Station, [CD-F is] in his black Acura, I'm about to send a picture out for it, guy's going to see [CD-F], and he's going to pull him out and CD-F is going to guide him to Goose Creek . . . . We're about a minute and a half from the gas station. Alright, [CD-F] has his left signal on, he's about to be turning into the gas station right here where the Arby's sign is, he's sitting in the middle median. . . . [CD-F] is turning in now.

Id. at 2:18–4:30. A DEA surveillance team followed CD-F as he entered the parking lot of the Pilot Travel Center. ECF No. 1176 at 22. They saw a black Nissan sedan with a North Carolina temporary tag and license plate cover advertising an automotive dealership in Gastonia, North Carolina—an area near Charlotte, North Carolina where the SOS stated that the courier would be traveling from. Id.

5

### B. The Traffic Stop and Vehicle Search

As Officer Donahue and Officer Maule received radio updates from TFO White, they observed CD-F's black Acura followed by a black Nissan traveling in their direction. ECF No. 634 at 7. As the black Nissan approached, Officer Donahue's radar clocked the black Nissan traveling at 57-mph in a 55-mph zone. Id. Officer Donahue then observed the black Nissan cross the fog line twice. Id. After observing the black Nissan engage in three traffic violations—and with knowledge of the controlled delivery—Officer Donahue initiated a traffic stop. Id.

When Officer Donahue approached the black Nissan, he encountered a bald man with a Hispanic accent—it was Wilson Lombida. ECF No. 1176, Ex. L, Officer Donahue Patrol Car Dash Cam. Wilson Lombida told Officer Donahue that his name was of "Spanish" origin and that he was traveling from Gastonia, North Carolina. Id. at 02:41. When Officer Donahue first asked Wilson Lombida why he was in Charleston, South Carolina, Wilson Lombida stated that he was a truck driver. Id. at 02:46. When asked again, Wilson Lombida stated that he was traveling to view a 1984 Ford Mustang that he had found on Craigslist, and that he had plans to return to North Carolina immediately afterwards. Id. at 03:09–06:10.

Next, Officer Donahue noted to Wilson Lombida that he had made good time considering the distance he had traveled, and Wilson Lombida responded, "I pulled over to get something to eat, and I lose track of like the road" while gesturing with his hands in a back-and-forth motion. Id. at 05:04. Wilson Lombida also stated, "I'm bad about getting speeding ticket because it's not good for me." Id. 05:14–05:16.

6

Officer Donahue asked Wilson Lombida if he was in possession of large sums of U.S. currency over $10,000. Id. at 06:35. Wilson Lombida responded that he did not bring money with him on his travels, not even to purchase the Mustang. Id. at 06:39. Officer Donahue next asked Wilson Lombida if he had any narcotics in the black Nissan. Id. at 06:40–06:52. As Wilson Lombida answered the questions regarding narcotics, Officer Donahue observed Wilson Lombida tighten his posture, cross his arms, and reduce his speech to an inaudible mumble. Id. at 6:52.

After explaining that he would be writing a ticket for speeding and the lane infractions, Officer Donahue asked Wilson Lombida for consent to search the black Nissan. Id. at 11:19–11:40. Wilson Lombida consented to the search, responding, "You want to search my car? Yeah, go ahead." Id. at 11:42.

As Officer Donahue began to search the black Nissan, Officer Maule engaged Wilson Lombida in casual conversation. ECF No. 1176, Ex. N, Officer Maule Body Mic in Car Camera, at 9:01–10:06. They discussed littering, cars, and travel. Id. Then, Wilson Lombida stated that he needed to use the restroom. Id. at 11:42. Next, Wilson Lombida asked Officer Maule, "He's not supposed to bring the dog to sniff my car?" Id. at 12:10. Officer Maule responded, "What, to sniff your car? I mean, it's not necessary." Id. at 12:18–12:22. Officer Donahue moved his search to the trunk compartment, removing items and the interior paneling from the trunk. What is said next is not clear, but Officer Maule can be heard saying, "We will put everything back the way we found it, we don't want to, we treat your stuff just like we would treat our stuff." Id. at 14:08.

While searching the engine compartment of the Wilson Lombida's black Nissan, Officer Donahue found a package wrapped in plastic and red chili flakes. ECF No. 1176

at 24–26.  The officers tested the contents of the package and found it to be approximately two kilograms of fentanyl—just as the SOS had indicated to CD-F and CD-H in the recorded calls.  Id.

On June 15, 2021 a grand jury entered a second superseding indictment against Wilson Lombida on charges of (1) conspiracy to distribute fentanyl in an amount of 400 grams or more, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and (2) possession with intent to distribute fentanyl in an amount of 400 grams or more, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  ECF No. 358.  On June 17, 2021, Wilson Lombida entered a plea of not guilty.  ECF 66.

On June 24, 2022, Wilson Lombida filed a motion to suppress evidence seized from the black Nissan during the traffic stop on June 1, 2021.  ECF No. 624.  On July 7, 2022, the government responded in opposition.  ECF No. 634.  Wilson Lombida replied on March 27, 2025.  ECF No. 1174.  As such, the motion is now ripe for the court's review.

## II.  STANDARD

The Fourth Amendment to the United States Constitution provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend. IV.  For a search to be reasonable it must usually be conducted pursuant to a valid warrant, or it must meet one of several recognized exceptions to the warrant requirement.  See Kentucky v. King, 563 U.S. 452, 459–60 (2011).

Courts often exclude evidence collected in violation of the Fourth Amendment from being used in the prosecution's case in chief against a criminal defendant at trial.

8

See Weeks v. United States, 232 U.S. 383, 398 (1914); Walder v. United States, 347 U.S. 62, 65 (1954); see also Mapp v. Ohio, 367 U.S. 643, 655 (1961).  However, "[e]xclusion is 'not a personal constitutional right,'" Davis v. United States, 564 U.S. 229, 236 (2011) (quoting Stone v. Powell, 428 U.S. 465, 486 (1976)), nor is it "a necessary consequence of a Fourth Amendment violation," Herring v. United States, 555 U.S. 135, 141 (2009). Rather, the sole purpose of the exclusionary rule is to deter future constitutional violations, and the Supreme Court has identified certain situations when "the benefits of deterrence . . . outweigh the costs" of applying the rule.  Herring, 555 U.S. at 143.  Thus, evidence collected pursuant to a warrant will usually be admissible and will only be suppressed "in those unusual cases in which exclusion will further the purposes of the exclusionary rule." United States v. Leon, 468 U.S. 897, 918 (1984).

## III.   DISCUSSION

Wilson Lombida asserts three grounds in his motion to suppress all evidence seized from his vehicle: (1) Officer Donahue did not have reasonable suspicion for the traffic stop, (2) Wilson Lombida withdrew his consent to search the vehicle, and (3) Officer Donahue's search exceeded the scope of Wilson Lombida's consent.  ECF No. 624 at 5–9.  The government argues that Officer Donahue's observation of Wilson Lombida committing traffic violations gave rise to sufficient reasonable suspicion to initiate the traffic stop and the collective knowledge of the information concerning controlled delivery operation from TFO White provided probable cause for the vehicle search.  ECF No. 634 at 11–23.  The court analyzes the traffic stop and vehicle search in turn.

### A. The Traffic Stop

Wilson Lombida challenges the traffic stop as unconstitutional, arguing that Officer Donahue lacked reasonable suspicion to initiate the stop. ECF No. 624 at 5–6. First, he asserts that he did not commit the traffic violations—speeding and crossing the fog line—that Officer Donahue stated were the basis for the traffic stop. Id. Second, he contends that Officer Donahue's visual determinations of the traffic violations are false because they are not supported by dashcam or speed radar evidence. Id.

"A traffic stop constitutes a 'seizure' under the Fourth Amendment and is thus subject to a reasonableness requirement." United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). "Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest," courts assess the reasonableness of a traffic stop pursuant to the two-prong standard from Terry v. Ohio, 392 U.S. 1 (1968). United States v. Green, 740 F.3d 275, 279 (4th Cir. 2014). That is, courts consider whether (1) the officer's actions in initiating the stop were justified at their inception and (2) whether the officer's actions during the stop were "reasonably related in scope to the circumstances that justified the stop." Id. (quoting Terry, 392 U.S. at 20).

Because Wilson Lombida does not contest the scope or duration of Officer Donahue's actions during the traffic stop, the court's focus is on the first prong of the Terry analysis. See ECF No. 624 at 5–6. The first prong of Terry is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (citing Arizona v. Johnson, 555 U.S. 323, 327 (2009)); see also United States v. Branch, 537

F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." ).  Courts assessing the reasonableness of a traffic stop must determine whether "sufficient objective evidence exists to demonstrate reasonable suspicion," Branch, 537 F.3d at 335, such that the "circumstances, viewed objectively, justify th[e] action," Palmer, 820 F.3d 640, 649 (quoting Whren, 517 U.S. at 813).  For reasonable suspicion to exist, an officer must be able to articulate more than an "'inchoate and unparticularized suspicion or hunch' of criminal activity."  Illinois v. Wardlow, 528 U.S. 119, 123–124 (2000) (quoting Terry, 392 U.S. at 27).  The reasonable suspicion test is based on the totality of the circumstances.  United States v. Perkins, 363 F.3d 317, 319 (4th Cir. 2004); see United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011) ("[A] court must look to the totality of the circumstances in determining whether the officer had a particularized and objective basis for suspecting criminal activity.").  Reasonable suspicion for an investigatory stop under Terry is a "less demanding standard than probable cause."  Wardlow, 528 U.S. at 123.

      The court finds that Officer Donahue possessed reasonable suspicion to initiate the traffic stop of Wilson Lombida's vehicle.  Officer Donahue reported that he used a speed radar to objectively determine that Wilson Lombida's vehicle was traveling 57 miles per hour in a 55 mile per hour zone as it passed his position.  ECF No. 634 at 7, 12.  Once Officer Donahue began to pursue Wilson Lombida's vehicle, but before he initiated the traffic stop, he witnessed Wilson Lombida's vehicle exit its lane of travel by crossing the fog line twice.  Id.  Under South Carolina law, both speeding and crossing the fog line

are traffic violations. See S.C. Code Ann. § 56-5-1520; S.C. Code Ann. § 56-5-1810, 1900. Officer Donahue's use of speed radar, in addition to his visual estimation that Wilson Lombida's vehicle was traveling two miles per hour above the posted speed limit, is objective evidence that supports a finding of reasonable suspicion for the traffic stop in the totality of the circumstances. See United States v. Sowards, 690 F.3d 583, 592–94 (4th Cir. 2012) (holding that additional "indicia of reliability" are required for an officer's visual estimate that a vehicle is traveling in slight excess of the legal speed limit). Officer Donahue's observation of Wilson Lombida's fog line violations were alone sufficient grounds to effectuate a lawful traffic stop. See, e.g., United States v. Diaz, 2018 WL 1697386, at *5 (D.S.C. Apr. 6, 2018) (finding fog line violation gave rise to reasonable suspicion for traffic stop even in absence of dashcam video). At the suppression hearing, Wilson Lombida did not provide the court with testimony or evidence to contradict Officer Donahue's report of the traffic stop. See ECF No. 1175.

Because Officer Donahue observed Wilson Lombida commit multiple traffic violations, he had sufficient reasonable suspicion to initiate the traffic stop. See Palmer, 820 F.3d at 649. As such, the traffic stop was reasonable under Terry, and therefore did not violate the Fourth Amendment or constitute grounds for suppression of evidence collected from Wilson Lombida's vehicle. See Green, 740 F.3d 275, 279 (4th Cir. 2014).

### B. The Vehicle Search

Wilson Lombida challenges the vehicle search as unconstitutional, arguing that he removed his consent to search and that Officer Donahue's search exceeded the scope of his consent. ECF No. 624 at 6–9. There is no dispute that the vehicle search was conducted without a warrant. Id.; ECF No. 634 at 13–23. The government asserts that,

independent of and prior to Wilson Lombida's consent, Officer Donahue possessed probable cause that the vehicle contained narcotics, and thus the search was reasonable pursuant to the automobile exception. ECF No. 634 at 18–23.

### 1. Automobile Exception and Collective Knowledge Doctrine

It is well-settled that "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Under the automobile exception, the police can search a vehicle without first obtaining a warrant if they have probable cause to believe the vehicle contains contraband or evidence of illegal activity. Maryland v. Dyson, 527 U.S. 465, 467 (1999) (per curium). "Probable cause to search a vehicle exists when 'reasonable officers can conclude that what they see, in light of their experience, supports an objective belief that contraband is in the vehicle.'" United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (quoting United States v. Ortiz, 669 F.3d 439, 446 (4th Cir. 2012)). In other words, "a search is not unreasonable if [it is] based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." United States v. Ross, 456 U.S. 798, 825 (1982).

The government contends that the basis of Officer Donahue's probable cause to search Wilson Lombida's vehicle was the collective knowledge of the DEA investigation team. ECF No. 634 at 17–23. Specifically, the government asserts that Officer Donahue objectively believed that Wilson Lombida's vehicle possessed narcotics because TFO White directly communicated information gathered from the recorded calls and real-time surveillance of the controlled delivery operation to him. See id. The court agrees.

The collective knowledge doctrine arises to answer questions "as to whether probable cause must be established only through the information personally known by the arresting or searching officer, or whether information known by other officers may also be factored into the equation." United States v. Ferebee, 957 F.3d 406, 411 (4th Cir. 2020). In general, the doctrine "applies when at least some, but not all, of an investigative team has actual knowledge of facts necessary to a finding of probable cause." United States v. Blauvelt, 638 F.3d 281, 289 (4th Cir. 2011) (citing United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996)). The Fourth Circuit "limits application of the doctrine to cases where the search or arrest is directed by an officer who himself has sufficient knowledge to amount to probable cause." Ferebee, 957 F.3d at 411 (citing United States v. Massenburg, 654 F.3d 480, 494 (4th Cir. 2011)). Applying the collective knowledge doctrine, the court may "substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*" when evaluating probable cause. Massenburg, 654 F.3d at 493 (emphasis in original).

The court's probable cause determination first looks to the knowledge of TFO White at the time of the vehicle search. See Blauvelt, 638 F.3d at 289. TFO White led the DEA investigation into the SOS and had conducted prior seizures of narcotics delivered from the SOS to Charleston, South Carolina. See ECF No. 634 at 1–2. CD-F and CD-H, as confidential informants to the DEA investigation, directly communicated information concerning the SOS's narcotics distribution operation to TFO White. Id. TFO White personally recorded and reviewed phone calls between CD-F, CD-H, and the SOS. Id. From the recorded calls, TFO White gathered additional information regarding the SOS's current location, use of couriers, vehicles used, delivery routes, methods of

distribution, and the type and quantities narcotics in transit. See ECF No. 1176 at 1–5. In particular, TFO White able to determine physical characteristics of the courier, the specific courier vehicle, and the type of narcotics from descriptions given by the SOS. Id. at 5–23. Further, TFO White was physically present in the vehicle with CD-F as he surveilled and communicated with the SOS and Wilson Lombida during the controlled delivery. Id. He instructed CD-F with what to say so as to guide the controlled delivery and confirm the information he had previously gathered, all while providing real-time information to the DEA investigation team via a shared radio channel. Id. As such, TFO White—based on the information he personally gathered during the DEA investigation and controlled delivery operation, along with his considerable experience and training in narcotics investigations— possessed probable cause to believe that Wilson Lombida's vehicle contained narcotics, independent of Wilson Lombida's consent to search. See Baker, 719 F.3d at 319.

      To apply the collective knowledge doctrine, the Fourth Circuit requires a showing that the instructing officer and the acting officer were working in a "vertical" collective knowledge relationship in which "information or instructions [were] communicated ("vertically") to acting officers" who effect the search and seizure. Massenburg, 654 F.3d at 493–494 (distinguishing a vertical collective knowledge relationship from that of a horizontal aggregation of information where an officer's decision to perform a search is "in total ignorance of the existence of that information"). In the instant action, TFO White was the lead agent of the DEA investigation team, organizing the controlled delivery operation after seizing multiple deliveries of narcotics from the SOS. ECF No. 634 at 1–2. He gathered preliminary information directly from confidential informants

15

within the SOS's chain of distribution and from their recorded communications with the SOS and Wilson Lombida.  Id.  As the controlled delivery operation unfolded, TFO White conducted surveillance and confirmed the identity of the courier and that the target vehicle contained the narcotics that the SOS had described.  ECF No. 1176, ECF No. 1176, Ex. F, Recorded Call 8, 9, & 10, at 03:18–03:31, 03:37.  In real-time, TFO White provided radio and text updates of the controlled delivery operation to Officer Donahue, instructing him to initiate the traffic stop and vehicle search.  Id., Ex. G, Recorded Call 11 & 12 CD-F & Lombida, at 2:18–4:30.  Thus, the record demonstrates that TFO White was the instructing officer and Officer Donahue was the acting officer, see Ferebee, 957 F.3d at 411, working in a vertical collective knowledge relationship to execute the search of Wilson Lombida's vehicle, see Massenburg, 654 F.3d at 493–494.

The court finds that Officer Donahue conducted a lawful search of Wilson Lombida's vehicle pursuant to the automobile exception because he possessed probable cause to believe that the vehicle contained narcotics.  See Maryland, 527 U.S. at 467.  Under the collective knowledge doctrine, the basis of Officer Donahue's probable cause was TFO White's direction to search Wilson Lombida's vehicle, based on TFO White's firsthand knowledge of the DEA investigation and controlled delivery operation.  See Ferebee, 957 F.3d at 411.  As such, the vehicle search did not violate the Fourth Amendment or constitute grounds for suppression of evidence collected from Wilson Lombida's vehicle.  See Katz, 389 U.S. at 357.

### 2. Scope of the Vehicle Search

The court finds that the scope of Officer Donahue's search of Wilson Lombida's vehicle did not exceed lawful bounds. The scope of a search pursuant to the automobile exception "is as broad as magistrate could authorize." United States v. Kelly, 592 F.3d 586, 589–90 (4th Cir. 2010) (citation omitted). Therefore, "once police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" Id. at 590 (quoting Ross, 456 U.S. at 825). Officer Donahue's search of Wilson Lombida's vehicle was lawful under the automobile exception because he had probable cause to believe that the vehicle contained narcotics. See Maryland, 527 U.S. at 467. Therefore, the permissible scope of the search encompassed the areas of Wilson Lombida's vehicle that could conceal the narcotics—including the trunk and engine compartments from which evidence was seized. See Kelly, 592 F.3d at 590.

Because Officer Donahue possessed reasonable suspicion to initiate the traffic stop, probable cause to search Wilson Lombida's vehicle, and conducted the vehicle search within lawful bounds, no Fourth Amendment violation occurred. As such, the court denies Wilson Lombida's motion to suppress.

## IV.  CONCLUSION

For the foregoing reasons the court **DENIES** Wilson Lombida's motion to suppress.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 26, 2026**
**Charleston, South Carolina**