**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 2:21-cr-00341-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| JESUS YOSMAY WILSON LOMBIDA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court of defendant Jesus Yosmay Wilson

Lombida's ("Wilson Lombida") motion for reconsideration, ECF No. 1257. For the

reasons set forth below, the court denies Wilson Lombida's motion for reconsideration.

## I.  BACKGROUND

### A.  The Controlled Delivery

In 2020, the Drug Enforcement Agency ("DEA") began investigating shipments

of fentanyl from a source of supply ("SOS") in Mexico to a distributor ("CD-F") in

Charleston, South Carolina. ECF No. 634 at 1. During the investigation, the DEA

intercepted and seized multiple kilograms of fentanyl and other narcotics intended for

delivery to CD-F. Id. In November 2020, the DEA and local law enforcement searched

the home of CD-F and seized a large quantity of cocaine. Id. at 1–2. Soon after, local

law enforcement located CD-H, an associate of CD-F within the narcotics distribution

network. Id. CD-F and CD-H agreed to cooperate with the investigation as confidential

informants. Id. CD-F told investigators that the SOS initially sent deliveries of

marijuana starting in 2019 but that, by early 2020, the SOS had begun to consistently

send packages containing fentanyl and methamphetamine. Id.

1

On May 27, 2021, CD-F informed DEA investigators that the SOS had contacted him and that the SOS stated that he could have multiple kilograms of fentanyl delivered to Charleston, South Carolina via a courier. Id. The DEA immediately planned a "controlled delivery" operation: by utilizing CD-F and CD-H to communicate with the SOS and the courier, the DEA investigators would control the movement of the delivery and intercept the narcotics during a traffic stop of the courier. See ECF No. 1176 at 1–3. DEA Task Force Officer White ("TFO White"), leading the investigation, recruited Lance Corporal William Donahue ("Officer Donahue") and K-9 Officer Laura Maule ("Officer Maule") of the South Carolina Highway Patrol to the operation. ECF No. 634 at 2. TFO White informed Officer Donahue and Officer Maule that they would be conducting the traffic stop of a courier vehicle that would likely be transporting narcotics and that CD-F and CD-H were cooperating with the investigation. Id. Officer Donahue and Officer Maule were instructed to conduct the traffic stop in a routine manner to avoid alerting the courier to the DEA investigation. Id.

On May 28, 2021, the DEA began recording phone calls between CD-F, CD-H, and the SOS. Id. In the first call, the SOS told CD-F that his couriers had "left two" and "took one somewhere else," such that CD-F should expect "two" to be delivered to Charleston, South Carolina. ECF No. 1176, Ex. A, Recorded Call 1 CD-F and SOS, at 00:13–00:20.[1] The SOS further explained, "but they two right there, you ain't got to give them nothing, you know, we'll, they'll wait for, for theirs when, whenever you're finished, but you gotta be real, real careful with these because they, they strong." Id. at

_____

[1] The court cites to the government's audio recording exhibits throughout this order. The relevant portions of each audio recording were transcribed and introduced in a single exhibit at the suppression hearing. See ECF Nos. 1175, 1176.

00:23–00:34.  The SOS then told CD-F to have CD-H call him to determine a delivery point and "line that up so he can go . . . receive it from them.  But just like I said be careful, whoever checks it, make sure that they know what they doing.  They're going to have to step on it.  Alright.  I just don't want to be responsible for any, you know, things."  Id. at 01:05–01:36.

Reviewing the first recorded call, TFO White understood that the SOS was "fronting" two kilograms of narcotics—i.e., that SOS would be supplying the narcotics and expecting payment at a later date from the proceeds of subsequent narcotics sales.  ECF No. 634 at 3.  Likewise, TFO White interpreted that the delivery would contain such "strong" narcotics such that CD-F needed to ensure both that the person who handled the contents of the delivery was aware of its strength and that they needed to "step on it" or dilute the narcotics before later distribution.  Id.

On a subsequent recorded call, the SOS coordinated with CD-H to determine the delivery point.  ECF No. 1176, Ex. B, Recorded Call 2 & 3 CD-H and SOS, at 00:35–01:04.  The SOS stated, "But like I told [redacted], you guys got to be real, real careful cause, they strong . . . too strong."  Id. at 01:42–02:03.  Shortly thereafter, the SOS called CD-H again to inform him that the courier had mistakenly driven the delivery to Charlotte, North Carolina and that the SOS was attempting to find someone to "grab 'em and take 'em over there" to Charleston, South Carolina.  Id. at 3:30–3:50, 4:30–4:36.

The SOS was next recorded on a call explaining the mistaken delivery to CD-F.  ECF No. 1176, Ex. C, Recorded Call 4 & 5 CD-F and SOS, at 00:13–00:18.  The SOS stated, "He's got the guy that took 'em over there, the same bald-headed guy, he's going to go pick 'em up and take them to the same place he met you at."  Id. at 00:19–00:29.

3

Further, the SOS then informed CD-F that he was attempting to convince the "bald-headed guy" to take the delivery to Charleston, South Carolina "where he was suppose to take them in the first place." ECF No. 1176, Ex. E, Recorded Call 7 CD-F & SOS, at 00:45–01:15.

On Monday, May 31, 2021, the SOS sent a text message to CD-F stating, "He's going in a car. Where do you want him to go." ECF No. 1176 at 8. CD-F did not reply. Id. The following morning, June 1, 2021, the SOS messaged, "He is on his way now . . . . Should be there in about 3 hours." Id. As directed by investigators, CD-F replied with the address of a Pilot Travel Center gas station in Goose Creek, South Carolina. Id. The SOS forwarded the address sent by CD-F to Wilson Lombida and notified CD-F that the courier was "not going in the truck. He's driving regular car." Id. at 12–13.

As the time for the delivery approached, TFO White recorded another call between CD-F and the SOS. CD-F told the SOS that he would send someone to meet the courier at the delivery point. ECF No. 1176, Ex. F, Recorded Call 8, 9, & 10 CD-F & SOS, at 00:30–00:40. In the recording, CD-F can be heard confirming to the investigators present in his vehicle that "[the SOS] says it's a black car" and telling TFO White that "I think it's like a Spanish guy or Cuban guy or something like that." Id. at 02:27–02:29, 03:38–03:40. The recording also captured radio messages between members of the investigation team relaying the location of CD-F, the updates from the SOS, and the descriptions of courier and courier vehicle. Id. at 03:18–03:31, 03:37.

The SOS called CD-F to notify CD-F that the courier had reached the Pilot Travel Center but asked if CD-F could "take him somewhere, where he can, you know, where there's less people, where he can give you that." Id. 04:06–04:13. The SOS explained,

"cause he said that, the way things look right there, it don't look like he can, like he can pull them out." Id. at 04:14–04:22. The SOS and CD-F agreed to move the delivery point to CD-F's apartment. Id. 04:22–04:43. The SOS forwarded an address sent by CD-F to the courier. ECF No. 1176 at 13. When communications began to dissolve, the SOS sent a message to CD-F that said "704 386 8508" and told CD-F to "call [the courier]" himself. Id. at 20.

CD-F called the phone number, and a man with a Hispanic accent answered. ECF No. 1176, Ex. G, Recorded Call 11 & 12 CD-F & Lombida, at 00:39. CD-F told the courier to follow his black Acura to the new delivery point once CD-F arrived at the Pilot Travel Center. Id. at 00:39–00:55. The courier agreed. Id. TFO White can be heard providing real-time updates of CD-F's movements and communications with the courier to the investigation team over the radio:

> We just shot a phone call to the people driving it. It is a Hispanic male, we are going to have [CD-F] pull into the Pilot Gas Station, [CD-F is] in his black Acura, I'm about to send a picture out for it, guy's going to see [CD-F], and he's going to pull him out and CD-F is going to guide him to Goose Creek . . . . We're about a minute and a half from the gas station. Alright, [CD-F] has his left signal on, he's about to be turning into the gas station right here where the Arby's sign is, he's sitting in the middle median. . . . [CD-F] is turning in now.

Id. at 02:18–04:30. A DEA surveillance team followed CD-F as he entered the parking lot of the Pilot Travel Center. ECF No. 1176 at 22. They saw a black Nissan sedan with a North Carolina temporary tag and license plate cover advertising an automotive dealership in Gastonia, North Carolina—an area near Charlotte, North Carolina where the SOS stated that the courier would be traveling from. Id.

5

### B. The Traffic Stop and Vehicle Search

As Officer Donahue and Officer Maule received the radio updates from TFO White, they observed CD-F's black Acura followed by a black Nissan traveling in their direction. ECF No. 634 at 7. As the black Nissan approached, Officer Donahue's radar clocked the black Nissan traveling at 57-mph in a 55-mph zone. Id. Officer Donahue then observed the black Nissan cross the fog line twice. Id. After observing the black Nissan commit three traffic violations—and with knowledge of the controlled delivery operation—Officer Donahue initiated a traffic stop. Id.

When Officer Donahue approached the black Nissan, he encountered a bald man with a Hispanic accent—it was Wilson Lombida. ECF No. 1176, Ex. L, Officer Donahue Patrol Car Dash Cam. Wilson Lombida told Officer Donahue that his name was of "Spanish" origin and that he was traveling from Gastonia, North Carolina. Id. at 02:41. When Officer Donahue first asked Wilson Lombida why he was in Charleston, South Carolina, Wilson Lombida stated that he was a truck driver. Id. at 02:46. When asked again, Wilson Lombida stated that he was traveling to view a 1984 Ford Mustang that he had found on Craigslist and that he had plans to return to North Carolina immediately afterwards. Id. at 03:09–04:10.

Next, Officer Donahue noted to Wilson Lombida that he had made good time considering the distance he had traveled, and Wilson Lombida responded, "I pulled over to get something to eat, and I lose track of like the road" while gesturing with his hands in a back-and-forth motion. Id. at 05:04. Wilson Lombida also stated, "I'm bad about getting speeding ticket because it's not good for me." Id. 05:14–05:16.

6

Officer Donahue asked Wilson Lombida if he was in possession of large sums of U.S. currency over $10,000.00  Id. at 06:35.  Wilson Lombida responded that he did not bring money with him, not even to purchase the Mustang.  Id. at 06:39.  Officer Donahue next asked Wilson Lombida if he had any narcotics in the black Nissan.  Id. at 06:40–06:52.  As Wilson Lombida answered the questions regarding narcotics, Officer Donahue observed Wilson Lombida tighten his posture, cross his arms, and reduce his speech to an inaudible mumble.  Id. at 06:52.

After explaining that he would be writing a ticket for speeding and the lane infractions, Officer Donahue asked Wilson Lombida for consent to search the black Nissan.  Id. at 11:19–11:40.  Wilson Lombida consented to the search, responding, "You want to search my car?  Yeah, go ahead."  Id. at 11:42.

As Officer Donahue began to search the black Nissan, Officer Maule engaged Wilson Lombida in casual conversation.  ECF No. 1176, Ex. N, Officer Maule Body Mic in Car Camera, at 09:01–10:06.  They discussed littering, cars, and travel.  Id.  Then, Wilson Lombida stated that he needed to use the restroom.  Id. at 11:42.  Next, Wilson Lombida asked Officer Maule, "He's not supposed to bring the dog to sniff my car?"  Id. at 12:10.  Officer Maule responded, "What, to sniff your car? I mean, it's not necessary."  Id. at 12:18–12:22.  Officer Donahue moved his search to the trunk compartment, removing items and the interior paneling from the trunk.  What is said next is not clear, but Officer Maule can be heard saying, "We will put everything back the way we found it, we don't want to, we treat your stuff just like we would treat our stuff."  Id. at 14:08.

While searching the engine compartment of the Wilson Lombida's black Nissan, Officer Donahue found a package wrapped in plastic and red chili flakes.  ECF No. 1176

7

at 24–26.  The officers tested the contents of the package and found it to be approximately two kilograms of fentanyl—just as the SOS had indicated to CD-F and CD-H in the recorded calls.  Id.

On June 15, 2021 a grand jury returned a second superseding indictment against Wilson Lombida on charges of (1) conspiracy to distribute fentanyl in an amount of 400 grams or more, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and (2) possession with intent to distribute fentanyl in an amount of 400 grams or more, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  ECF No. 358.  On June 17, 2021, Wilson Lombida entered a plea of not guilty.  ECF 66.

On June 24, 2022, Wilson Lombida filed a motion to suppress evidence seized from the black Nissan during the traffic stop.  ECF No. 624.  The court held a hearing on Wilson Lombida's motion to suppress on February March 31, 2025, ECF No. 1175, and denied the motion January 26, 2026, ECF No. 1256.

Wilson Lombida filed a motion for reconsideration on February 9, 2026.  ECF No. 1257.  Defendant the United States of America (the "government") responded in opposition on May 4, 2026.  ECF No. 1276.  As such, the motion is fully briefed an now ripe for the court's review.

## II.  STANDARD

"[D]espite the nonexistence of a specific rule in the Federal Rules of Criminal Procedure, a district court has the inherent power, and thus jurisdiction, to reconsider interlocutory orders prior to entry of judgment on such orders."  United States v. Breit, 754 F.2d 526, 530 (4th Cir. 1985).  Because the Federal Rules of Criminal Procedure do not provide guidance for motions for reconsideration, courts "look to the rules governing

8

civil cases as a substantive guidepost." See, e.g., United States v. Benjamin, 2023 WL 3325268, at *2 (D.S.C. May 9, 2023); United States v. Tyson, 779 F. Supp. 3d 741, 752 (E.D. Va. 2025).

Pursuant to Federal Rule of Civil Procedure 54(b), reconsideration of an interlocutory order is appropriate on three grounds: "(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." U.S. Tobacco Coop. Inc. v. Big South Wholesale of Va., LLC, 899 F.3d 236, 257 (4th Cir. 2018) (internal quotation marks omitted) (explaining this standard "closely resembles" the standard under Rule 59(e)).

A Rule 54(b) motion "may not be used merely to reiterate arguments previously rejected by the court." Sanders v. Lowe's Home Ctrs., LLC, 2016 WL 5920840 at *4 (D.S.C. Oct. 11, 2016) (citation omitted). Likewise, "[m]otions to reconsider are not proper where the motion merely asks the court to rethink what the Court had already thought through rightly or wrongly." United States v. Smith, 2017 WL 4685357, at *1 (E.D.N.C. Oct. 18, 2017) (citation omitted).

### III.   DISCUSSION

Wilson Lombida moves the court to reconsider its denial of his motion to suppress. ECF No. 1257. First, Wilson Lombida argues that he was effectively in custody at the inception of the traffic stop, so his statements should be excluded from the court's probable cause determination and trial evidence because he did receive Miranda warnings at the outset. ECF No. 1257-1 at 1–2. Second, he appears to contend that the government did not meet its burden to demonstrate that Officer Donahue had reasonable suspicion to initiate the traffic stop. Id. at 2–4. Wilson Lombida does not present new

9

evidence or argue that there has been an intervening change in the applicable law.  See id. at 1–4.  Thus, he must demonstrate that the court's finding in its denial of his motion to suppress—specifically, that no Fourth Amendments violation occurred because Officer Donahue possessed reasonable suspicion to initiate the traffic stop, probable cause existed to search Wilson Lombida's vehicle, and the vehicle search was within lawful bounds—is the result of a "clear error of law."  See Big South Wholesale, 899 F.3d at 257.  Wilson Lombida has failed to make such a showing.

### A.  Wilson Lombida Was Not In Custody at the Outset of the Traffic Stop

Wilson Lombida argues that the court erred in determining that his pre-Miranda statements should not be suppressed because he was not "in custody" during the traffic stop.  ECF No. 1257-1 at 1–2.  In his motion, he asserts that "from the moment he was stopped, [he] was never free to go and in custody."  Id. at 1.  The government responds in opposition that the traffic stop was routine for a speeding and lane violation, and Wilson Lombida was not placed "in custody" until narcotics were discovered during the vehicle search.  ECF No. 1276 at 3–4.  The court agrees with the government.

Pursuant to Miranda v. Arizona, a criminal suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  384 U.S. 436, 479 (1966).  The procedural safeguards of Miranda warnings apply only when a suspect is both "in custody" and subject to interrogation.  See Rhode Island v. Innis, 446 U.S. 291, 300 (1980).  A suspect is considered to be "in custody" "either upon formal arrest or under any other circumstances where the suspect is

10

deprived of his freedom of action in any significant way." Berkemer v. McCarty, 468 U.S. 420, 429 (1984). If there has been no formal arrest, a suspect is "in custody" when "under the totality of the circumstances, a suspect's freedom of action is curtailed to a degree associated with formal arrest.'" United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001) (quoting Berkemer, 468 U.S. at 440).

The court considers two questions to determine whether a suspect's circumstances amount to "formal arrest." See United States v. Leggette, 57 F.4th 406, 410 (4th Cir. 2023). First, the court looks to "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Pressley, 990 F.3d 383, 388 (4th Cir. 2021) (quoting United States v. Hashime, 734 F.3d 278, 282–83 (4th Cir. 2013). If it is determined that a reasonable person would believe that he is not at liberty to leave, the court then asks, "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes v. Fields, 565 U.S. 499, 509 (2012). This is an objective inquiry. J. D. B. v. North Carolina, 564 U.S. 261, 270–71 (2011); see also Parker, 262 F.3d at 419 ("Custody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead [on] the objective circumstances of the interrogation.").

The court's determination stands: Wilson Lombida was not "in custody" from the inception of the traffic stop until the narcotics were discovered in his vehicle, and there are no Miranda grounds warranting suppression of his statements. See ECF No. 1256 at 10–12. Without citation to the record or suppression hearing transcript, Wilson Lombida's arguments are premised on the reassertion of an argument that the court

rejected at the suppression hearing—that the DEA investigation team determined that Wilson Lombida would be searched and arrested prior to Office Donahue engaging the traffic stop. See id. at 1–2; see also Tr. 75:25–77:20 ("Well, if they didn't find any drugs, what were they going to arrest him for, speeding?"). It is well established that questioning during an investigatory stop generally does not render a person "in custody" for Miranda purposes. See Maryland v. Shatzer, 559 U.S. 98, 113 (2010) ("Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop . . . does not constitute Miranda custody."); Howes, 565 U.S. at 510 ("temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop does not constitute Miranda custody."). Likewise, Fourth Circuit case law is clear that a routine traffic stop lacks the necessary level of coercion to amount to custodial or formal arrest such that a driver is "in custody." See, e.g., Leggette, 57 F.4th at 411; United States v. Hall, 2021 WL 5754904, at *8 (4th Cir. Dec. 3, 2021). Therefore, contrary to his arguments, Wilson Lombida was not "in custody" for Miranda purposes simply because he was the subject of a traffic stop. See id.; Howes, 565 U.S. at 510; see also United States v. Austin, 2018 WL 3093528, at *4 (D.S.C. June 22, 2018) (finding that an officer's routine questioning of an individual suspected of illegal hunting and ordering him out of the vehicle to run a computer check on his driver's license and hunting license was "analogous to a Terry stop where no Miranda warning is required").

The court's objective inquiry of the traffic stop demonstrated that Wilson Lombida's freedom was not "curtailed to a degree associated with a formal arrest" during the traffic stop. See Parker, 262 F.3d at 419. Nothing in the record evinces that the traffic stop was beyond that of an "ordinary," "temporary and brief" detention. See

Berkemer, 468 U.S. at 437–40 ("the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda itself" such as prolonged, coercive station house interrogations). Officer Donahue's questioning of Wilson Lombida was typical of a speeding and lane violation—including, a general investigation of Wilson Lombida's destination, purpose of travel, and traffic violation history. See ECF No. 1176, Ex. L, Officer Donahue Patrol Car Dash Cam at 02:41–05:16. Although Officer Donohue's questions regarding large sums of currency or narcotics did not concern the traffic violations, Officer Donahue possessed all of the information regarding the DEA investigation and Wilson Lombida's involvement in the controlled delivery as the courier prior to the traffic stop. See ECF No. 1256 at 13–16. Therefore, Officer Donahue possessed "a reasonable, articulable suspicion" that Wilson Lombida's vehicle contained narcotics, see Illinois v. Wardlow, 528 U.S. 119, 123 (2000), allowing Officer Donahue to ask whether Wilson Lombida was in possession of contraband relevant to narcotics trafficking, see, e.g., United States v. Jackson, 280 F.3d 403, 405 (4th Cir. 2002) (finding no Miranda violation at a "Terry-like stop" where an officer at a traffic violation checkpoint questioned an individual about narcotics and firearms after smelling a strong odor of marijuana and observing a rifle in plain view as he approached the vehicle).

Because Wilson Lombida has failed to demonstrate that it was a "clear error of law" for the court to determine that he was not "in custody" during the traffic stop under the totality of the circumstances, the court denies Wilson Lombida's motion for reconsideration as to his arguments concerning Miranda warnings. See Big South Wholesale, 899 F.3d at 257.

13

**B.  The Government Established Reasonable Suspicion for the Traffic Stop**

Wilson Lombida appears to argue that the court erred in finding that Officer Donahue had reasonable suspicion to initiate the traffic stop.  ECF No. 1257-1 at 2–4. He implicitly asserts that the court did not properly shift the burden to the government to establish a legitimate basis for traffic stop.  See id.  The government responds in opposition that Wilson Lombida's argument is an inaccurate statement of the law and that the court has already found the government established sufficient grounds for reasonable suspicion in both the traffic violations and information of the controlled delivery operation.  ECF No. 1276 at 4.  The government is correct.

In deciding a motion to suppress, the district court is empowered to make findings of fact and conclusions of law.  United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005)).  "As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence."  United States v. Adkinson, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981)).  Once the defendant establishes a basis for his suppression motion, the burden shifts to the government."  Id. (citing United States v. Matlock, 415 U.S. 164, 177–78 (1974)).

In the order denying his motion to suppress, the court found that Officer Donahue had reasonable suspicion to initiate the traffic stop because he observed Wilson Lombida speeding and crossing the fog line—both traffic violations under South Carolina law.  See ECF No. 1256 at 11–12; see also Hall, 2021 WL 5754904, at *7 ("[W]hen an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.").  The court credited Officer Donahue's use of a speed radar as an additional

"indicia of reliability" to his visual estimate of Wilson Lombida traveling in excess of the speed limit. Id. (citing United States v. Sowards, 690 F.3d 583, 592–94 (4th Cir. 2012)).

At base, Wilson Lombida's arguments are general disagreements with the court's reasonable suspicion determination. See ECF No. 1257-1 at 2–4. His motion does not address the court's analysis, and he does not cite legal authority or the record to support his burden shifting argument. See id. The court reiterates that, aside from speculation concerning the reliability of the speed radar and whether the traffic stop was sufficiently "walled off" so as to conceal the DEA investigation, Wilson Lombida has not provided the court with testimony or evidence to discredit Office Donahue's traffic violation report. See id.; ECF No. 1175. Consequently, Wilson Lombida's motion improperly seeks to relitigate the court's finding that Officer Donahue had reasonable suspicion to initiate the traffic stop, and thus it does not warrant reconsideration under Rule 54(b). See Smith, 2017 WL 4685357, at *1.

Because Wilson Lombida has failed to demonstrate that the court's reasonable suspicion determination was a "clear error of law," the court denies Wilson Lombida's motion as to his arguments concerning whether there was a legitimate basis for the traffic stop. See Big South Wholesale, 899 F.3d at 257.

15

## IV.   CONCLUSION

For the foregoing reasons the court **DENIES** Wilson Lombida's motion for reconsideration.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 11, 2026**
**Charleston, South Carolina**

16